**IN THE UNITED STATES OF AMERICA
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **QUENTIN D. GROCE,** ) | **CASE NO. 1:12-CV-270** |
| ) | |
| **Plaintiff,** ) | |
| ) | **MAGISTRATE JUDGE GREG WHITE** |
| v. ) | |
| ) | |
| **MICHAEL ASTRUE,** ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY ADMINISTRATION,** ) | |
| ) | |
| **Defendant.** ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff Quentin D. Groce ("Groce") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Groce's claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is affirmed.

### I. Procedural History

On June 26, 2008, Groce filed an application for SSI alleging a disability onset date of November 1, 2007, and claiming that he was disabled due to mood and personality disorders. (Tr. 62.) His application was denied both initially and upon reconsideration. Groce timely requested an administrative hearing.

On September 3, 2010, an Administrative Law Judge ("ALJ") held a hearing during which Groce, represented by counsel, Groce's mother, and an impartial vocational expert ("VE") testified. On September 27, 2010, the ALJ found Groce was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II. Evidence

### *Personal and Vocational Evidence*

Age 25 at the time of his administrative hearing, Groce is a "younger" person under social security regulations. *See* 20 C.F.R. § 416.963. (Tr. 21.) Groce has a limited ninth grade education and no past relevant work. (Tr. 21 & 139.)

### *Hearing Testimony*

At the hearing, Groce testified to the following:

- He lives with his mother, two sisters, and a niece. (Tr. 34.)

- He is 5'5" tall and weighs 220 pounds. *Id*.

- He attended the Cleveland Public schools into the tenth grade, receiving special educational services in all subjects.[1] (Tr. 35.)

- Every two weeks he sees a doctor and case manager at Murtis Taylor Mental Health Clinic ("Murtis Taylor"). (Tr. 39.) He is prescribed Cogentin, Depakote, and Haldol to keep him calm. (Tr. 40.) While on this medication, he was involved in a couple of fights. *Id*.

- He attempted suicide two times. (Tr. 40.) Both times he was taken to South Pointe hospital and then transferred to Bridgeway, where he stayed for about two weeks. (Tr. 40-42.)

- He still sometimes thinks about hurting or killing himself. (Tr. 42.)

- He does not go out with friends. *Id*. If he leaves the house, it is for an appointment at Murtis Taylor. *Id*. His case manager drives him to and from his appointments. (Tr. 43.)

- At home, he watches television, listens to the radio, and "constantly" cleans up. (Tr. 44.) He visits with his cousin, either at home or his aunt picks him up. *Id*.

- He is paranoid and panics whenever he leaves the house. (Tr. 42.)

- He does not have a driver's license. (Tr. 44.)

Groce's mother next testified to the following:

- Quentin sits in his bedroom most of the day, except to use the bathroom, get some food, or watch television. (Tr. 48.) He seldom interacts with other family members, but prefers to retreat in his room. (Tr. 49.)

---

[1]The record reflects that Groce was in the ninth grade for two years, and dropped out of school during the tenth grade. (Tr. 386.)

- She works in the evenings, but as far as she knows Quentin stays home. (Tr. 50.)

- Quentin has a temper problem. (Tr. 51.) When he gets angry, she sees him push things and knock items around. *Id.*

- She was informed by Quentin's case worker that as an adult, Quentin was involved in fights. (Tr. 51-52.)

- Quentin approached her two times stating his intention of killing himself and she took him to the hospital. (Tr. 52.)

- When Quentin was in high school, she knew he had problems learning, but she did not think it was anything severe until she received a call from the school stating that Quentin threatened to kill himself. (Tr. 52-53.)

- As far as Quentin's academic performance, Quentin was set up with an Individual Education Plan ("IEP") to help him learn, which was not successful. (Tr. 53.) He left school without graduating. *Id.*

- Quentin does not date, attend movies, ball games or concerts. (Tr. 49-51.)

The ALJ posed the following hypothetical:

Let's assume you're dealing with an individual who's the same age as the Claimant, with the same educational background and past work experience.

Further assume, this individual retains a residual capacity for medium work with the following additional limitations. This individual is limited to simple, routine, repetitive tasks, not performed at a production rate or pace, with minimal interaction with the public; and, he must avoid concentrated exposure to strong odors, fumes, dusts . . . chemicals, or other respiratory irritants. Could this individual perform any of the Claimant's past relevant jobs?

(Tr. 54-55.) The VE testified that the hypothetical person would not be able to perform any of Groce's past jobs as they were performed at the heavy exertional level.[2] *Id.* The VE indicated that this individual could work as a commercial cleaner, kitchen helper, and cook helper, all medium, unskilled jobs. (Tr. 55-57.)

The ALJ posed a second hypothetical as follows:

Please assume you're dealing with an individual the same age as the Claimant, with the same educational background and past work experience; and, that, this individual is also restricted to medium work with the same environmental restrictions against pulmonary irritants that I identified in the first hypothetical.

---

[2] Groce testified that he briefly worked as a stocker in a warehouse, landscaper, and a cook at a fast food restaurant. (Tr. 35-38.) Because Groce's earnings from these jobs was minimal, the ALJ found Groce had no past relevant work. (Tr. 21.)

3

> But, in addition, this individual lacks any useful ability to maintain attention and concentration, to perform tasks involving interaction with the public or more than minimal contact with co-workers, to handle normal work productions [sic] demands, to deal with changes in a work setting, or to understand, remember and carry out even simple job instructions. Could this individual perform any of his past work?

(Tr. 57-58.) The VE testified that such an individual would be unemployable. (Tr. 58.)

Under questioning by counsel, the VE testified that an accommodation would be required if the individual under the first hypothetical had to miss a good portion of one day a week to attend counseling sessions at Murtis Taylor. (Tr. 58-59.)

### III. Standard for Disability

A claimant may be entitled to receive SSI benefits when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

The ALJ found Groce established medically determinable, severe impairments, due to borderline intellectual functioning ("BIF"), chronic obstructive pulmonary disease/asthma,

4

depressive disorder, personality disorder, degenerative joint disease, and obesity; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Groce was determined to have a Residual Functional Capacity ("RFC") for a limited range of medium work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Groce was not disabled.

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the

regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Groce contends the ALJ erred in evaluating the credibility of his subjective complaints. (Doc. No. 17 at 7.) Groce also asserts that the ALJ disregarded treatment records regarding his mental limitations and, instead, relied on the opinion of Herschel Pickholtz, Ed.D., a state agency consultative psychologist.[3] Since the ALJ used Dr. Pickholtz's opinion in the credibility assessment, these arguments are related.

**Credibility**

A claimant's subjective statements concerning his symptoms are not enough to establish disability. *See* SSR 96-7p, Introduction. When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment. Second, the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms." *Id.* If these claims are not substantiated by the medical record, the ALJ must make a credibility determination of the individual's statements based on the entire case record. *Id.* Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, "[t]he determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual

---

[3] As Groce's argument focuses on the ALJ's evaluation of his mental condition, the Court will limit its analysis accordingly.

and to any subsequent reviewers the weight the adjudicator gave to the individuals statements and the reason for the weight." SSR 96-7p, Purpose section; *see also Felisky v. Bowen,* 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so"); *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d at 733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* SSR 96-7p, Purpose. Beyond medical evidence, there are seven factors that the ALJ should consider.[4] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross.*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

After finding Groce had severe impairments of BIF as well as depression and personality disorders, the ALJ evaluated their intensity, persistence and limiting effects. When formulating the RFC,ced the ALJ found Groce's subjective complaints only partially credible as follows:

> The claimant's activities of daily living suggest that he has, at most, moderate difficulties in his activities of daily living as a result of his mental impairments. He testified that he currently lives wit his mother, two sisters, and niece. A typical day involves watching TV, listening to the radio, cleaning, and maybe hanging out on the back porch. The claimant testified that his case manager picks him up for his mental health appointments, but records from Murtis Taylor indicate multiple occasions in which the claimant arrived over an hour late to appointments, that he needed prompts to attend appointments, and that he arrived at appointments on his own (13F). The claimant reported to Dr. Pickholtz that he uses public transportation to get around (3F). The claimant's testimony is inconsistent with reports he has made to his treating and examining doctors and therapists. Dr. Pickholtz opined that the

---

[4] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, Introduction; *see also Cross*, 373 F. Supp. 2d at 732.

7

> claimant's "overall description of his daily activities is inconsistent with any major depression or any psychotic processing interfering with his taking care of himself." (3F). Dr. Pickholtz opined that the claimant maintained the ability to perform simple, repetitive tasks. The totality of the evidence suggests that while the claimant is independently able to take care of the majority of his activities of daily living, his borderline intellectual functioning causes moderate difficulties, which limit him to jobs performing simple repetitive tasks.
>
> The claimant has exhibited moderate difficulties in social functioning. At hearing, the claimant testified that he last worked in 2006 when he quit working because he got into a verbal confrontation with a coworker. He stated that he left work without giving notice because he wanted to keep himself from "doing something." The claimant testified that he socializes with only his immediate family and his cousin and that he does not go shopping, to church, to ballgames, or to restaurants. Contrarily, the claimant reported to Dr. Pickholtz that he socializes with friends, relatives and girlfriends, that he uses a computer to email and play games, and that he attends church (3F). The claimant's mother testified that he sometimes goes places with his cousin, but since she works nights she only observes his behavior during the day. The claimant testified that he rarely leaves the house other than to attend sessions at Murtis Taylor Mental Health Service Center ("Murtis Taylor"), and that his case manager from Murtis Taylor drives him to and from his appointments. When pressed at hearing, he admitted that he would go to his cousin's house on occasion. The claimant further testified that he had been involved in multiple fights in early 2010 and stated that the fights took place a couple streets away from his home while he was "on his way home." He did not explain where he was coming home from, but clearly he was not returning with his caseworker from an appointment at Murtis Taylor. Again, the inconsistency in his statements weaken the credibility of his testimony; however, considering his reports of conflicts with his coworkers and his limited social life, the evidence supports finding the claimant has moderate difficulties in social functioning which limit him to jobs involving minimal interaction with the public.

(Tr. 18.)

The ALJ discussed Groce's daily activities finding that he was able to engage in activities including, cleaning, personal grooming, and using public transportation. (Tr. 17.) Specifically, Groce told Dr. Pickholtz that he "washes laundry, irons, shops for clothes, and uses public transportation when he wants to go somewhere" (Tr. 16) and "he socializes with friends, relatives and girlfriends, that he uses a computer to email and play games, and that he attends church." (Tr. 18.) The ALJ also discussed Groce's medication to treat his mental impairments as follows:

> The claimant is currently using prescribed medication to treat his mental impairments. His treatment records note that his symptoms seem to be reduced by medication (5F) and he testified that his medications treat his nervousness and calm him down. Records from Murtis Taylor indicate that the claimant has had poor compliance with his medications (11F, 13F, 14F). The claimant reported to his case manager that his medications made him "feel different." (13F). It is unclear if he was referring to any side effects of the medication, or just emphasizing that his medications alleviate his symptoms. The claimant did not testify to any side effects arising from his medications. The record suggests that the claimant's ability to

8

engage in a limited range of unskilled work is not impaired by medication. (Tr. 19.) The ALJ further noted that treatment records from Bridgeway indicated that Groce was "given a rather benign diagnosis and was noted to show improvement within three days of admission after adjustment of his medication (2F)." The Court finds that the ALJ sufficiently explained his credibility findings using several of the factors required under SSR96-7p. As such, Groce's argument is without merit.

### *Consultative Opinion*

Groce also contends that the ALJ improperly relied entirely upon Dr. Pickholtz's biased opinion rather than Groce's treatment records from Murtis Taylor.

The ALJ is charged with a duty to evaluate all of the medical opinions in the record and resolve any conflicts that might appear. 20 C.F.R. § 416.927. As such, the ALJ should give each opinion the weight deemed appropriate based upon factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether it is consistent with the entire record. 20 C.F.R. § 416.927(d)(2); SSR 96-2p. It is the responsibility of the ALJ alone, not a reviewing court, to weigh the medical evidence and resolve any conflicts that might appear. 20 C.F.R. § 416.927(d).

Furthermore, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §

[ ] 416.927." *Blakley*, 581 F.3d at 408.[5]

Opinions from agency medical sources are also considered opinion evidence. 20 C.F.R. § 416.927(f). The regulations mandate that "[u]nless the treating physician's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do work for us." 20 C.F.R. § 416.927(f)(2)(ii). More weight is generally placed on the opinions of examining medical sources than on those of non-examining medical sources. *See* 20 C.F.R. § 416.927(d)(1). However, the opinions of non-examining state agency medical consultants can, under some circumstances, be given significant weight. *Hart v. Astrue*, 2009 WL 2485968, at *8 (S.D. Ohio Aug. 5, 2009). This occurs because nonexamining sources are viewed "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96–6p, 1996 WL 374180. Thus, the ALJ properly weighs the opinions of agency examining physicians and agency reviewing physicians under the same factors as treating physicians including weighing the supportability and consistency of the opinions, as well as the specialization of the physician. *See* 20 C.F.R. § 416.972(d), (f).

The ALJ addressed Dr. Pickholtz's opinion as follows:

> The undersigned has also considered the opinion of the consultative examiner, Dr. Pickholtz, and the opinions of the State agency medical and psychological consultants pursuant to Social Security Ruling 96-9p. Dr. Pickholtz opined the claimant had only mild restrictions in his activities of daily living, social functioning and concentration, persistence and pace, though he opined that the claimant's psychiatric complaints could support finding moderate difficulties in occupational functioning (3F). His opinion is based on observations and interactions with the claimant during consultative examination and is well explained. The State agency

---

[5] Pursuant to 20 C.F.R. § 404.927(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

> psychological consultants found only mild limitations resulting from the claimant's mental impairments (4F, 9F). The undersigned notes that since Dr. Pickholtz and the consultants' assessments were made, the record has been supplemented with testimony and additional medical evidence from Murtis Taylor. The State agency medical consultant opined that the claimant could perform medium exertional work as long as he avoided concentrated exposure to fumes, odors, dusts, gases and poor ventilation. The consultant's opinion was based on evidence of degenerative disc disease and pulmonary function tests showing an obstructive impairment. No additional medical evidence regarding the claimant's asthma or degenerative joint disease has been added to the record since the consultant's assessment was made. After reviewing the entire record, the undersigned finds that the above residual functional capacity is consistent with the record as a whole.

(Tr. 20.)

The ALJ also noted the discrepancy in the IQ tests administered to Groce. In May, 2001, Groce took the Wechsler Adult Intelligence Scale III ("WAIS-III") at the Cleveland Public schools as part of a special education evaluation. (Tr. 387.) Resulting IQ scores were full-scale 76 and verbal and performance, 75 and 80, respectively. *Id.* Based upon the full-scale score of 76, Groce was assessed with BIF. *Id.* In February, 2008, Dr. Pickholtz administered the same test, resulting in a full-scale IQ of 57, with verbal and performance scores of 64 and 56, respectively. (Tr. 192.) Dr. Pickholtz noted that the 2008 scores were "inconsistent with [Groce's] abilities to utilize the computer as well as to play cards and game appropriately and is suggestive of exaggeration." (Tr. 193.) Based upon Dr. Pickholtz's opinion that the 2008 IQ scores were invalid, the ALJ rejected those scores and, instead, adopted the doctor's opinion that based upon the 2001 IQ score, Groce's intelligence fell in the low average or borderline range. (Tr. 18.)

Groce argues that Dr. Pickholtz's opinion was biased and unprofessional, citing to numerous allegations that are unsupported by the record.[6] (Doc. No. 17 at 11-12.) Groce also

---

[6]Some of the doctor's statements that Groce took issue with include:

- ". . . he seemed to present himself in a disinterested sluggish fashion and oftentimes wouldn't supply the answers I requested of him, which he was capable of responding to." (Tr. 191.)

- The claimant tested "deficient" in all the following WAISS-III test scores: vocabulary, similarities, arithmetic, digit span, comprehension, picture completion, digit-symbol-

11

argues that Dr. Pickholtz ignored the fact that treatment records from Murtis Taylor diagnose depression and schizoaphective disorder. As noted, the ALJ did indeed find Groce to have severe impairments of depressive and personality disorders. He found Groce to be moderately impaired in activities of daily living, in social functioning, as well as in concentration, persistence, and pace. Dr. Pickholtz found Groce to have only mild restrictions in these areas. (Tr. 18, 194.) Clearly, the ALJ gave some weight to Murtis Taylor's treatment records. Groce has not provided an RFC assessment completed by a treating provider indicating that he is functionally limited by his psychological conditions.

Dr. Pickholtz diagnosed Groce with mild depression and minimal psychotic processing, which the doctor noted was "consistent with [Groce's] abilities to take care of himself and to relate to others on a routine and regular basis." (Tr. 194.) Dr. Pickholtz also assessed "a history of polysubstance abuse, which [Groce] would not discuss and was related to his passive/aggressive tendencies and his characterological features along with some tendencies towards fabrication and exaggeration." *Id.* Dr. Pickholtz summarized his report as follows:

> At the present time, I would not suggest [Groce] monitor benefits in an independent fashion and need to be monitored to make sure he doesn't return to any kind of drug or alcohol usage. It was very difficult to come up with a definitive diagnosis as a result of his tendencies toward exaggeration. I do believe he should be able to work unless this is contraindicated by his current treators. He presents himself as being somewhat deteriorated yet his overall daily activities [are] inconsistent with this and his current levels of intellectual functioning are far below his daily activities as well as premorbid levels of functioning, which I think is reflective of exaggeration as well.

(Tr. 195-196.)

The ALJ provided sufficient reasons for giving portions of Dr. Pickholtz's opinion

---

    coding, block design, matrix reasoning, picture arrangement. (Tr. 192). Despite those scores, the doctor unabashedly declares that this was a result of "exaggeration." (Tr. 193.)

- "At the present time, he wouldn't speak up consistently and tended to present himself in a negative light and lied about several issues. I think there was a tendency to put forth minimal effort during the evaluation and he was not very honest either." (Tr. 193.)

(Doc. No. 17 at 12.)

12

significant weight. The ALJ considered the relevant factors identified in 20 C.F.R. § 416.927(c) including supportability, consistency, examining relationship, and specialization. Groce has not presented any evidence that a Murtis Taylor provider, or any other treating source, found Groce's work abilities to be functionally limited by his mental impairments. The decision, therefore, was properly supported and was consistent with the overall record.

### VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

s/ Greg White<br>
United States Magistrate Judge

Date:   November 8 , 2012